IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

SHIRLENE G. PACE SMITH,            )
                                   )            4:08CV3264
          Plaintiff,               )
                                   )
     v.                            )        MEMORANDUM OPINION
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
          Defendant.               )

This matter is before the Court for resolution of Shirlene G. Pace Smith's appeal of a final determination of the Commissioner of the Social Security Administration denying her application for Social Security Disability and Supplemental Security Income benefits under Title XVI of the Social Security Act. This Court has jurisdiction under 42 U.S.C. § 405(g).

I.    BACKGROUND

Shirlene G. Pace Smith filed an application for disability insurance benefits and Supplemental Security Income ("SSI") benefits on February 27, 2003, alleging she had been disabled since October 31, 2002, by reason of a back impairment, thyroid and hormone problems, recurrent obstructions of her small bowel, and irritable bowel syndrome. *See* Filing No. 13, Social Security Transcript ("Tr.") at 67-70, 84, 348. Smith did not complete high school, but later obtained her GED. *Id.* at 370. She completed two years of college and obtained an associate of arts degree in business and a medical secretarial degree. *Id.* She has been employed as a home attendant, housekeeper, janitor, mail carrier, office worker, and telephone solicitor. *Id.* at 77, 88, 110-17, 133, 430, 534, 557.

Smith's application was denied initially and on reconsideration. *Id.* at 352, 357. Following a hearing on December 10, 2004, an Administrative Law Judge ("ALJ") found Smith was not disabled as defined in the Social Security Act at any time through the date of the decision. *Id.* at 22. On April 14, 2005, the Appeals Council of the Social Security Administration denied Smith's request for review. *Id.* at 7-13. Smith appealed that determination to the United States District Court for the District of Nebraska and the ALJ's decision was reversed and the action remanded. *See Pace v. Barnhart*, Case No. 7:05-CV-5008, Filing No. 27, Memorandum of Decision at 5 (D. Neb. June 21, 2006).

The district court found that the ALJ had improperly discounted the opinions of Smith's treating physician, Dr. Dan Nguyen, and several other doctors because they had not attended medical school in the United States. *Id.* at 2-3. The court found the ALJ's decision was "tainted with an appearance of prejudice" because of the ALJ's "comments and references to foreign medical education" and remanded for another hearing before a different ALJ. *Id.* at 5.

At the first hearing, on December 10, 2004, Smith testified that she was employed in 1994 as a telemarketer. *Id.* at 373. She was allowed to sit or stand at that job if her back bothered her, but eventually had to quit because the pain in her lower back "was too excruciating." *Id.* at 413. The record shows that Smith worked as a telephone solicitor from 1993 to 1995. *Id.* at 88, 110, 114, 373-74. She earned only $587.00 in 1993, $4,128.17 in 1994, and $324.04 in 1995. *Id.* at 77, 82.

Smith testified that she had been working as an in-home caregiver for a disabled man on October 31, 2002, when she injured her shoulder attempting to prevent the man

from falling.  *Id.* at 383.  Since then, she has not engaged in substantial gainful employment, although she worked part-time for two months in 2003 doing secretarial work but had to quit because of back pain.  *Id.*

She testified that at the time of the hearing she experienced daily pain at a level of seven or eight on a scale of one to ten.  *Id.* at 411.  The record shows that she occasionally had to stand during the hearing.  *Id.* at 405, 411, 415.  She stated that she could sit comfortably for twenty to thirty minutes and then had to change positions.  *Id.* at 405.  She could not walk a block without difficulty and had to use a cane to balance her weight.  *Id.* at 414.

A vocational expert also testified at the hearing.  He testified that the exertion level of Smith's former job as a home health aide would be classified as medium to heavy and the exertion level of her job as a telemarketer would be classified as sedentary or light.  *Id.* at 406.  He stated that a hypothetical person who could not sit for more than three hours per day, even with a sit/stand option, could not be employed in the national economy on a full-time basis.  *Id.* at 410.

At the second hearing, before a different ALJ, in 2006, Smith testified that her back hurt from the middle of her back to her tailbone and radiated down her right leg to her foot.  *Id.* at 453.  She stated that she was always in pain and would rate it at seven or eight to sometimes nine on a scale of one to ten.  *Id.*  She also stated she had numbness in her right leg.  *Id.* at 454.  She is unable to do dishes, housecleaning or laundry.  *Id.* at 456.  She stated that if she stands for twenty minutes her back will go into spasms and she falls to the floor.  *Id.*  She can sit for only twenty to thirty minutes before her leg goes numb and

3

her back goes into spasms. *Id.* at 458. She can alleviate the pain to some extent by sitting in a recliner with her legs elevated. *Id.* She has trouble with her hands as a result of ulnar neuropathy and drops things because her fingers are numb. *Id*. at 459. Smith also testified that she continues to have trouble with her right shoulder and can't wash or brush her hair. *Id.* at 496-97. She stated that she was unable to seek treatment for her injury in 2002 because she had lost Medicaid coverage when her daughter turned eighteen. *Id.* at 497.

With respect to her gastrointestinal problems, she stated that her "stomach closes off" and she will then have to forego eating until her bowels move. *Id*. at 461-62. She stated that she regularly gets intestinal "traveler's infections" that cause diarrhea and pain that she rates at the level of ten on a scale of one to ten. *Id.* at 463. She described that it "feels like somebody is inside your stomach cutting you with knives or razors basically." *Id.* at 464. She takes antibiotics for seven days every other week for the intestinal infections. *Id.* at 465. Her other medications include Synthroid, Protonix, Levbid, Vivelle, Flexeril, Lorcet, Xanax and Phenergan. *Id.* at 544.

A medical expert, Dr. Morris Alex, also testified at the second hearing. *Id.* at 467-76, 478-86. He had reviewed Smith's medical records. *Id.* at 486. He stated that, in his opinion, the records did not support a finding that Smith had an impairment of listing-level severity. *Id.* at 474-75, 484. He stated there was not enough evidence in the record for him to evaluate Smith's claim of ileal blocking. *Id.* at 480. He further stated that the claimant's gastrointestinal symptoms could possibly meet a listing, or at least reduce her functioning below a sedentary level, if the record were complete and additional testing such

4

as a CAT scan demonstrated that she had Crohn's disease, an "organic process in the ileum" or ileal blocking due to organic disease.  *Id.* at 480, 486-87.   He explained that Smith's repeated surgeries could account for intermittent blockage by adhesions and that repeated intermittent blockage by adhesions could support Smith's testimony about the pain she was having.  *Id.* at 488.   The ALJ indicated at the hearing that "it would be extremely difficult to get a CAT scan" because "the agency doesn't have the resources." *Id.* at 489.  With respect to the complaints of musculoskeletal pain, Dr. Alex testified that Smith's MRIs were essentially normal and that the records in the file, most notably, her range of motion results, indicated that she should be limited to light work.  *Id.* at 478-79. He did not think Smith would require any additional limitations with respect to bending or lifting, except that she would be "limited in terms of working around hazardous machinery, climbing ladders or scaffolds" and "[s]he should avoid excessive heat and cold."  *Id.* at 479. The most recent MRI he reviewed was from 2003.  *Id.* at 468.

A vocational expert also testified at the hearing.  *Id.* at 492-94, 498-501.  She testified that a hypothetical individual with a vocational profile identical to that of Smith, who could stand no more than 30 minutes and needed the ability to sit or stand every thirty minutes for five minutes, had loss of feeling in her right hand, and certain limitations on lifting could perform the job functions of Smith's former job as a telephone solicitor.  *Id.* at 498-99.  The vocational expert testified, however, that a hypothetical individual with those limitations and the additional limitation of either fatigue or pain that would keep her out of the workplace more than three days per month would have difficulty sustaining employment.  *Id.* at 500.

The medical evidence in the record shows that Smith complained of and sought treatment for an array of medical problems, including back pain and gastrointestinal distress, for many years before the alleged onset of her disability. *Id.* at 167-292. Dr. Dan C. Nguyen has been her primary care physician since 1988. *Id.* at 292. Smith has been treated for acute back strain, lumbar disc disorder, a hiatal hernia, peptic ulcer disease, fibromyalgia[1], migraine headaches, cervical disc disorder, chronic gastritis, tendinitis, chronic pancreatitis, hypothyroidism, myalgia, myofascial pain syndrome,[2] a rotator cuff tear, bilateral trocanteric bursitis, right supraspinus tendinopathy, chronic opioid treatment, ulcers, duodenitis, cholecystitis,[3] and irritable bowel syndrome. *Id.* at 762-776, 295, 793. She has had numerous surgeries including an ulnar nerve transposition, an appendectomy, three caesarian sections, a hysterectomy, three surgeries to correct a "misadventure with a ureter of the kidney" (when her ureter was cut during the hysterectomy), an oophorectomy, gallbladder removal, a breast biopsy, and sinus surgery. *Id.* at 202, 284, 335. Medical records also indicate that she had anxiety and possible depression. *Id.* at 784.

---

[1]Fibromyalgia is a syndrome of chronic pain of musculoskeletal origin but uncertain cause. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally there must be point tenderness in at least 11 of 18 specified sites. Stedman's Medical Dictionary (27th ed. 2000), *available at* Stedmans 148730 (Westlaw). *See also* Stedman's Medical Dictionary 725 (28th ed. 2006) ("chronic widespread aching and stiffness, involving particularly the neck, shoulders, back, and hips, which is aggravated by the use of the affected muscles").

[2]Myofascial means "of or relating to the fascia surrounding and separating muscle tissue." Stedman's Medical Dictionary (27th ed. 2000), *available at* Stedmans 265710 (Westlaw).

[3]Cholecystitis is inflammation of the gallbladder. Stedman's Medical Dictionary (27th ed. 2000), *available at* Stedmans 75780 (Westlaw).

6

Dr. Nguyen's office notes show regular visits with complaints of back and neck pain dating back to 1988 and complaints of stomach distress beginning in 2000. *Id.* at 256-351, 761-74. She underwent an ulnar nerve transposition on July 18,1981. *Id.* at 281, 278. She was treated in 1991 and 1992 for severe neck pain and for trouble with her right arm. *Id.* at 274, 317 to 319. She received an epidural injection that afforded no relief. *Id.* at 277. Dr. Ramon Salumbrides, a rheumatologist, reported in 1992 that "so much pain arising from a chronic cervical spondylosis[4] is unusual for a patient so young" and found that "her pain appears to be more from a chronic myofascial type of origin." *Id.* at 282.

In April 1993, a treating orthopedist's office notes indicated that Smith had reported lower back problems "on and off for a long period of time." *Id.* at 272. At that time she reported symptoms that were more pronounced, including numbness and tiredness in both legs. *Id.* Records show she was treated by an orthopedic specialist in December 1993 for complaints of a heavy, tired feeling in her legs and pain with sitting, sneezing, walking, and standing. *Id.* at 264-65. He reported that Smith had back and lower extremity problems and "her MRI does show degenerative changes in the lower two lumbar discs." *Id.* at 260. The MRI showed central bulging at the 4th disc, degeneration of the 4th and 5th discs and mild stenosis mainly from facet joint enlargement at 4-5. *Id.* at 261. She was seen by a neurologist in 1999 for persistent pain in her neck, after reporting intermittent pain since 1993. *Id.* at 291. The neurologist diagnosed neck strain, "possible myofascial in type." *Id.* at 291.

---

[4]Spondylosis is ankylosis of the vertebra; "often applied nonspecifically to any lesion of the spine of a degenerative nature." Stedman's Medical Dictionary (27th ed. 2000), *available at* Stedmans 382100 (Westlaw). Ankylosis is stiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint. *Id.* at 23900.

In 1999, Smith was referred to a rheumatologist who noted she had "very localized musculoskeletal pain in the left flank and hip," but did not fulfill the complete criteria for fibromyalgia at that time.  *Id.* at 283.  He also noted she had "multiple positives, "including difficulty with sleep, swollen lymph glands, increased weight and a feeling of depression and fatigue."  *Id.* at 285.  His impression was "myofascial pain of the left lower back with mechanical low back pain, chronic since age 9."  *Id.* at 286.  He noted that her treatment would be similar to treatment for fibromyalgia.  *Id.*

On April 4, 2001, Smith presented at the emergency room in acute distress as a result of severe lumbrosacral strain.  *Id.* at 202-04.  She was admitted to the hospital for pain control.  *Id.* at 208.  Admission notes indicate that she had a history of gastritis and irritable bowel syndrome.  *Id.* at 209.  She underwent physical therapy at that time.  *Id.*  X-rays in April 2001 showed disc space narrowing at L5-S1.  *Id.* at 208.  An MRI of the lumbar spine showed "flattening of the anterior thecal sac and slight bulging of the intervertebral disc at L4-L5" which was "more prominent on the right."  *Id.* at 201.  In September and December of 2001 she had epidural injections to treat a diagnosis of bulging disc with radiculopathy  *Id.* at 169-71.  An MRI ordered by Dr. Nguyen in June 2003 showed "low grade bulging of discs at L4-L5, noting "there is bulging of the discs centrally and slightly to the midline at L4-L5 with mild deformity of the anterior wall of he thecal sac" and "very minor flattening of the disc posteriorly at L5-S1 and "some narrowing of the L5-S1 disc space."   *Id.* at 259.  Over the years, Smith has been prescribed numerous medications and she has consistently taken narcotic and non-narcotic pain medications, including  Darvocet,  Bancap HC,  Ultram,  Vioxx,  Tramodol,  Norflex,  Lorcet,  Vicodin,

8

Cymbalta, hydrocodone, morphine, and ibuprofen.  *See id.* at 203, 265, 272, 274, 287, 771, 782, & 805.

On January 28, 2003, Smith's treating physician, Dr. Nguyen, expressed the opinion that Smith was unable to work due to lumbar disc disorder.  *Id.* at 293.  He later clarified that "she has been complaining of localized musculoskeletal pain in her lower back and hip" and "has diffuse pain moving in a migratory fashia over various parts of her body" and reported she also "has problems with irritable bowel syndrome, chronic gastritis and hiatal hernia."  *Id.*  He reported that her symptoms had gotten progressively worse since November 2002 and that his opinion was that she "suffers from psychosomatic illness and fibromyalgia and is not able to perform any job which requires light duty activity."  *Id.*  Although Dr. Nguyen's clinical notes of office visits are largely illegible, the record shows numerous visits.  *Id.* at 231-41, 256-60.  Dr. Nguyen referred Smith to several specialists, including an orthopedic surgeon, rheumatologist, a neurologist, a gastroenterologist, and pain management specialists and received reports from those specialists.  *See id.* at 260, 284-87, 290-91, 281, 568.  Dr. Nguyen's records also contain reports of diagnostic tests, X-rays, MRIs and blood work.  *See id.*

At the request of the Commissioner, Smith was examined by Dr. David Lindley on April 29, 2003.  He reported that she was crying during the exam.  *Id.* at 243.  His impression was chronic back pain, hypothyroidism and possible depression.  *Id.* at 244.  His examination of her musculoskeletal system showed tenderness in paralumbar muscles and also in the lower parathoracic muscles and in the base of the neck in the paracervical muscles.  *Id.* at 243.  He noted that she had "limited ROM of the spine, when she is laid

9

down, she has to turn to her side to get up and she cannot lie down with her legs straight, she has to bend her knees due to pains in her back which puts her legs straight." *Id.* A range-of-motion chart also showed some limitations in the spine. *Id.* at 232.

With respect to Smith's gastrointestinal complaints, records of X-rays from an examination on March 30, 1993, showed metallic clips in her abdomen and a suture and stint in the ureter. *Id.* at 274. The record shows that Smith underwent a gastroscopy with biopsy of the duodenum, antrum, esophagus, and a colonoscopy on August 11, 2000, after complaints of abdominal pain, nausea and vomiting. *Id.* at 217. She was diagnosed as having a small hiatal hernia and a pyloric channel deformity. *Id.* She was examined by a specialist after several months of abdominal pain. *Id.* at 288. His impression was low grade pancreatitis.[5] *Id.*

In September 2005, Smith was admitted to Great Plains Regional Medical "in severe distress" with abdominal pain and vomiting "pretty much continuous for two days." *Id.* at 568-78. Her diagnosis on admission was pyloric stenosis.[6] *Id.* at 579. She was ultimately diagnosed with gastric outlet obstruction. *Id.* at 607-30. Imaging showed surgery clips in the upper right quadrant of the abdomen and left pelvis. *Id.* at 578-79. In February 2006, Smith was again admitted to Great Plains Regional Medical Center for treatment of

---

[5]Pancreatitis an acute inflammation of the pancreas accompanied by the formation of necrotic areas and hemorrhage into the substance of the gland; clinically marked by sudden severe abdominal pain, nausea, fever, and leukocytosis; areas of fat necrosis are present on the surface of the pancreas and in the omentum because of the action of the escaped pancreatic enzyme (trypsin and lipase). Stedman's Medical Dictionary (27th ed. 2000), *available at* Stedmans 294810 (Westlaw).

[6]Pyloric stenosis is a narrowing of the gastric pylorus, especially by congenital muscular hypertrophy or scarring resulting from a peptic ulcer. Stedman's Medical Dictionary (27th ed. 2000), *available at* Stedmans 385090 (Westlaw).

abdominal pain and vomiting.  *Id.* at 659.  Her diagnosis on admission was "paralytic ileus."[7]  *Id.* at 662.  X-rays showed "findings consistent with an ileus."  *Id.* at 657.  A diagnostic imaging consultation report states "findings are most likely due to adynamic ileus."  *Id.* at 662.  The report further states "[p]robable pancreatic calcifications projected over the mid abdomen.  This can be seen in patients with chronic pancreatitis.  Surgical clips in the abdomen and pelvis.  Vascular calcifications in the pelvis."  *Id.* at 662.  Another report noted "incidental note of partial lumbarization[8] of S1."  The diagnosis was "improvement of mild ileus."  *Id.* at 662-63.  Examinations in 2007 revealed an old injury to her shoulder and an MRI of her right shoulder on June 9, 2007, revealed a large tear of the rotator cuff.  *Id.* at 793-95.

On Octover 19, 2007, the second ALJ issued a decision that was partially favorable to Smith.  *Id.* at 424-37.  He found Smith disabled, but only as of October 1, 2006.  *Id.* at 433.  He found the record established that Smith had the following medically determinable impairments which imposed more than slight limitations on her ability to function:  recurrent obstructions of the small bowel possibly due to surgical adhesions, a history of irritable bowel syndrome, a chronic pain syndrome, right supraspinous tendinopathy, bilateral trocanteric bursitis with recent evidence of a torn right rotator cuff, lumbar disc disease with low grade disc bulging at L4-L5 and L5-S1, and very mild degenerative disc disease of the

---

[7]Ileus is mechanical, dynamic, or adynamic obstruction of the bowel; may be accompanied by severe colicky pain, abdominal distention, vomiting, absence of passage of stool, and often fever and dehydration. Stedman's Medical Dictionary (27th ed. 2000), *available at* Stedmans 199580 (Westlaw).

[8]A congenital anomaly of the lumbosacral junction characterized by development of the first sacral vertebra as a lumbar vertebra, resulting in six lumbar vertebrae instead of five.  Stedman's Medical Dictionary (27th ed. 2000), *available at* Stedmans 233330 (Westlaw).

11

cervical spine. *Id.* at 431. He found that none of these impairments met the listings. *Id.* at 433. He stated that, prior to October 1, 2006, the impairments imposed some limitations on her ability to perform work-related functions, but she could perform a reduced range of sedentary work and remained capable of performing her past relevant work as a telephone solicitor. *Id.* at 424-37. With respect to functional limitations, the ALJ found that prior to October 1, 2006, Smith could lift ten pounds frequently, sit six hours in an eight-hour workday, and stand or walk two hours in an eight-hour workday, but would need to alternate sitting and standing every half hour, would need a cane for ambulation, could not engage in repetitive pushing or pulling, and could not reach above shoulder level. *Id.* at 433. He further found that she would have unlimited use of her hands for grasping and gripping, but would be limited in her ability to handle, finger and feel, due to numbness in her fingers. *Id.* Also, she could bend, twist, and turn frequently; climb occasionally; and crawl, stoop, squat, and kneel less than occasionally. *Id.* Finally, the ALJ found that Smith could not work around machinery or at unprotected heights, she would need to avoid exposure to temperature extremes and environmental irritants, and she would be only slightly limited in her ability to understand, remember, and carry out detailed instructions and respond to work pressures associated with unskilled work. *Id.*

The ALJ found that prior to October 1, 2006, "the medical evidence of record did not support the severity of symptoms alleged by the claimant." *Id.* at 436. He relied on the testimony of consulting physicians for the proposition that "any symptoms associated with her irritable bowel syndrome would have been 'treatable'" and noted consulting physician Dr. Alex's testimony "that the record did not support her allegations of intestinal blocking

12

due to adhesions, and . . . that, intestinal blocking would have been corrected with surgery which was not required." *Id.* He also relied on the report of consulting physician Dr. Lindley who found in 2003 that Smith "could bend from the waist and reach fingers to within six inches of the floor." *Id.* at 433. The ALJ's conclusions with respect to Smith's residual functional capacity for sustained work activity prior to October 1, 2006, were also based on an MRI report of June 2003 that showed "only mild degenerative disc disease with no root involvement." *Id.* at 433. The ALJ discounted the opinion of Smith's treating physician, Dr. Nguyen, because Dr. Nguyen had not cited specific clinical or laboratory findings to support his conclusion and because his opinions were contrary to those of the consulting physicians and to the results of the June 2003 MRI. *Id.*

The ALJ found that as of October 1, 2006, the evidence established that Smith would have had to "miss approximately three days of work per month due to abdominal pain and cramping," which would "preclude any type of substantial and gainful work activity on a sustained basis." *Id.* at 436. The Appeals Council denied Smith's second appeal. *Id.* at 417-21.

II.   DISCUSSION

A.   Law

The district court will affirm the Commissioner's decision to deny benefits when substantial evidence on the record as a whole supports the ALJ's decision. *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009)*.* The Court of Appeals for the Eighth Circuit has reiterated that "the 'substantial evidence on the record as a whole' standard requires a more rigorous review of the record than does the 'substantial evidence' standard." *Minor*

13

*v. Astrue,* 574 F.3d 625, 627 (8th Cir. 2009); *see also Burress v. Apfel*, 141 F.3d 875, 878 (8th Cir.1998) ("As this court has repeatedly stated, the 'substantial evidence in the record as a whole' standard is not synonymous with the less rigorous 'substantial evidence' standard."). "'Substantial evidence' is merely such 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion,'" but "[s]ubstantial evidence on the record as a whole," requires a court to conduct "a more scrutinizing analysis." *Minor,* 574 F.3d at 627 (quoting *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir.1989)). In its review, the court must take into account record evidence that fairly detracts from the ALJ's decision. *Tilley,* 580 F.3d at 679. The court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Id.*

The Social Security Administration employs a familiar five-step sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a) (1998); *Cox v. Apfel,* 160 F.3d 1203, 1206 (8th Cir. 1998). Under the Commissioner's regulations, the determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and his or her age, education and work experience. 20 C.F.R. § 404.1520(a); *Flanery v. Chater,* 112 F.3d 346, 349 (8th Cir. 1997).

> The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work. *King v. Astrue,* 564 F.3d 978, 979 n. 2 (8th Cir. 2009). Through step four of this analysis, the claimant has the burden of showing that she is disabled. *Id.* Only after the analysis reaches step five does the burden shift to the Commissioner to show that there are other jobs in the economy that a claimant can perform.

*Id.*

At step three of the sequential evaluation, if the claimant is found to suffer from an impairment that is listed in the Appendix to 20 C.F.R. Part 404, Subpart P ("the listings") or is equal to such a listed impairment, the claimant will be determined disabled without consideration of age, education, or work experience. *Flanery,* 112 F.3d at 349. The listings specify the criteria for impairments that are considered presumptively disabling. 20 C.F.R. §§ 404.1525(a), 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009).

Step four requires the Commissioner to consider whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work. *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009). "If so, the Commissioner 'will find that [the claimant is] not disabled.'" *Id.* (quoting 20 C.F.R. § 404.1520(a)(4)(iv)). "RFC is defined as 'the most [a claimant] can still do despite' his or her 'physical or mental limitations.'" *Masterson v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004) (quoting 20 C.F.R. § 404.1545(a)). When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others. *See Pearsall v. Massanari,* 274 F.3d 1211, 1217-18 (8th Cir. 2001); *see also* 20 C.F.R. §§ 404.1545, 404.1546.

According to the Agency's regulations, work should not be considered "past relevant work" unless it was performed at a substantial gainful activity ("SGA") level. *See  Mueller,* 561 F.3d at 841; 20 C.F.R. §§ 404.1565(a), 416.965(a). "Past relevant work is work that

15

you have done within the past 15 years,[9] that was substantial gainful activity, and that lasted long enough for you to learn how to do it."  *Mueller,* 561 F.3d at 841 (quoting 20 C.F.R. § 404.1560(b)(1)).  During 1993, 1994, and 1995, average monthly earnings of $500.00 were required to be considered SGA.  *See* 20 C.F.R. §§ 404.1574(b), 416.974(b).

A treating physician's opinion is given controlling weight "on the issue of the nature and severity of a claimant's impairment if that opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'"  *Pate-Fires*, 564 F.3d at 943 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p, 1996 WL 374188, at *2 (Social Security Administration, July 2, 1996) (stating that when a treating source renders a medical opinion that is well supported by medically acceptable diagnostic techniques and consistent with the other substantial evidence in the claimant's record, "the adjudicator must adopt a treating source's medical opinion irrespective of any finding he or she would have made in absence of the medical opinion").  The record must be evaluated as a whole to determine whether the treating physician's opinion should control.  *Tilley,* 580 F.3d at 679.  The treating physician's opinion is given this weight because of his "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 416.927(d)(2).  By contrast, "[t]he opinion of a consulting physician who examines a claimant once or not at all does not

---

[9]To decide whether a claimant has the RFC to perform "past relevant work," the ALJ analyzes whether a claimant's work during the 15-year period ending on the date a claimant was last insured rises to the level of substantial gainful activity.  *Mueller,* 561 F.3d at 841.  In this case, Smith's last insured date is March 31, 2007.  Filing No. 13, Tr. at 81.  Thus, the applicable period is from March 31, 1992,  to March 31, 2007.

generally constitute substantial evidence." *Kelley v. Callahan,* 133 F.3d 583, 589 (8th Cir. 1998).  In addition, "whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations also provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." 20 C.F.R. §404.1527(d)(2); *see Tilley,* 580 F.3d at 680.

According to Eighth Circuit precedent, when assessing the credibility of a claimant's subjective allegations of pain, the ALJ must consider the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions.  *Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009).  An ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them, but may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole.  *Id.*  "Allegations of disabling pain made by claimant seeking social security disability benefits may be discredited by evidence that claimant has received minimum medical treatment and/or has taken only occasional pain medication."  *Kelley,* 133 F.3d at 589.  Also, it is "relevant to credibility when a claimant leaves work for reasons other than her medical condition."  *See Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005). Acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain and reflect negatively on a claimant's credibility.  *Medhaug*, 578 F.3d at 817.  However, an ability to engage in some life activities, despite pain, does not mean a claimant retains the ability to work.  *See Tilley*, 580 F.3d at 681 (holding, in the context of a fibromyalgia case, that limited ability to complete light housework and short errands does not mean a claimant has the ability to

perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world).

It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.  *Sims v. Apfel,* 530 U.S. 103, 111 (2000) (noting that "Social Security proceedings are inquisitorial rather than adversarial.").  It is well settled that the ALJ's duty to fully and fairly develop the record includes the responsibility of ensuring that the record includes evidence addressing the alleged impairments at issue from either a treating or examining physician.  *Snead v. Barnhart,* 360 F.3d 834, 838 (8th Cir. 2004) ("The ALJ possesses no interest in denying benefits and must act neutrally in developing the record").  The duty to develop the record extends to cases where the claimant is represented by counsel.  *Id.*  The ALJ's duty to develop the record in a social security hearing may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped.  *Smith v. Barnhart,* 435 F.3d 926, 930 (8th Cir. 2006); *Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir. 2000) (holding that it was improper for an ALJ to rely on the opinions of reviewing physicians alone).

### B.    Analysis

The issue before the court is whether there is substantial evidence based on the record as a whole to support the ALJ's conclusion that Smith could have performed her past relevant work as a telephone solicitor as of October 31, 2002.  The court finds that there is not.

The ALJ again improperly discredited the opinion of Smith's treating physician, Dr. Nguyen.  Although Dr. Nguyen may not have cited specific objective evidence in his letter expressing his opinion on Smith's ability to work, the record reveals that Nguyen's opinion

18

was based on voluminous objective evidence.  Nguyen had treated Smith over the course of fifteen years at the time of the opinion.  His office notes contain records of Smith's many office visits and examinations.  He received and reviewed the reports of many specialists and tests.  Smith was treated for many years for back, neck and diffuse pain as well as for gastrointestinal complaints.  The court finds that the record contains objective evidence that supports Smith's subjective reports of debilitating pain.

The ALJ improperly relied on the report of a consulting physician who had examined the claimant only once, as well as the report of a consultant who had never examined Smith, but had reviewed the medical records.  That evidence does not constitute substantial evidence to support the conclusion that Smith was not disabled when balanced against the record evidence that supports a finding of disability.

Further, the ALJ mischaracterized the testimony of the consulting physician who testified at the hearing.  Contrary to the ALJ's contention, Dr. Alex testified that Smith's subjective complaints could be explained by bowel obstructions caused by adhesions.  His explanation that "some people get adhesions, etc. after abdominal surgery" describes Smith's situation.  The record shows an extensive history of surgical procedures, including a botched procedure, that could have contributed to formation of adhesions.

The ALJ also erred in discrediting Smith's subjective complaints of back and neck pain and unrelenting fatigue.  Her complaints are supported by objective evidence.  MRI reports dating back many years show degenerative changes and abnormalities.  No doctor has expressed the opinion that the spine abnormalities, together with symptoms of myofascial pain and fibromyalgia, would not be likely to cause pain as severe as she alleged.  Further, Smith's lengthy history of regular doctor visits and multiple procedures and tests lends credence to her subjective complaints.  Her consistent use of pain

19

medication also supports the finding that her subjective complaints were real.  Smith's daily activities are not inconsistent with chronic, severe pain.  She testified she generally does nothing more strenuous than folding laundry.  Her ability to engage in some life activities, despite the pain, does not mean she retained the ability to return to her past work as a telemarketer.  The ALJ did not address the difficult diagnoses of fibromyalgia and degenerative spine changes, nor did he acknowledge the physical limitations that would result from these diseases.  *See Tilley,* 580 F.3d at 681 (stating "Fibromyalgia is an elusive diagnosis; '[i]ts cause or causes are unknown, there's no cure, and, of greatest importance to disability law, its symptoms are entirely subjective.'") (citation omitted).  Moreover, the ALJ did not consider the effects of Smith's acknowledged severe impairments, in combination, on her ability to perform sedentary work.[10]  The record shows Smith suffered from and sought treatment for gastrointestinal and abdominal problems before 2006 and those complaints should have been considered.

The court finds that the record as a whole does not contain substantial evidence to support the ALJ's conclusion that Smith could have performed the work-related functions of her previous employment as a telephone solicitor.  Little in the record supports the ALJ's conclusions with respect to Smith's residual functioning capacity.  There is no evidence, except for the report of a consulting physician to support the exertional limitations adopted by the ALJ.  On the contrary, the record is replete with medical evidence, compiled over the course of many years, that shows that Smith suffers chronic unremitting pain.  The record shows that Smith has consistently sought treatment for the same recurring

---

[10]As pointed out by the government in its brief, in finding that Smith could return to her former employment as a telephone solicitor, the ALJ may also have erred in his conclusion that Smith's former employment as a telemarketer was "substantial gainful activity."  *See* Filing No. 17, Brief at 14-15.  The record shows that Smith did not earn the minimum average earnings of $500.00 per month to sustain that finding. Filing No. 13, Tr. at 82.

complaints of pain.  Smith has been diagnosed with fibromyalgia and with degenerative spine changes and her complaints correspond directly with the characteristics of those diseases.

The Court sees no reason to further prolong this case.  Reversal and remand for an immediate award of benefits is the appropriate remedy where the record overwhelmingly supports a finding of disability.  *Pate-Fires v. Astrue*,  564 F.3d at 947; *see also Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir.1984) ("Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate.").  Here, the clear weight of the evidence fully supports a determination that Smith was disabled within the meaning of the Social Security Act as of October 31, 2002, and is entitled to benefits as of that date.  Accordingly, the decision of the ALJ is reversed and this action is remanded to the Commissioner for an award of benefits.

IT IS ORDERED that:

1.   The decision of the ALJ is reversed.

2.   This action is remanded to the Commissioner for an award of benefits.

3.   A final judgment will be entered in accordance with this memorandum opinion.

DATED this 6th day of August, 2010.

BY THE COURT:

s/ Joseph F. Bataillon
Chief United States District Judge